**In re Joseph A. LOPES, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 97–BG–1927.**

District of Columbia Court of Appeals.

Argued March 8, 2001.

Decided April 12, 2001.

Marion E. Baurley, Washington, DC, for respondent.

Traci M. · Tait, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before SCHWELB, FARRELL, and REID, Associate Judges.

SCHWELB, Associate Judge:

In a proposed simultaneous disposition of three District of Columbia disciplinary proceedings instituted by our Bar Counsel and one reciprocal discipline case that originated in Maryland, the Board on Professional Responsibility has recommended that Joseph A. Lopes be suspended from practice for six months, *nunc pro tunc* to July 29, 1998, and that his suspension be followed by a two-year period of probation, with conditions. Bar Counsel agrees that Lopes should be suspended for six months, but excepts to the recommended probation, arguing instead that as a condition of reinstatement following his suspension, Lopes should be required to demonstrate his fitness to practice law. Although Bar Counsel's position is not unreasonable, we apply our deferential standard of review and direct the imposition of discipline consistent with that recommended by the Board.

## I.

## THE PROCEEDINGS AGAINST LOPES

The evidentiary facts, which are largely undisputed, were developed in hearings conducted before Hearing Committee Number Two in July and October 1997. The Committee found that, in the original disciplinary cases, Lopes committed ethical violations primarily involving neglect and dishonesty. The Board adopted the Committee's evidentiary findings. The Board further found that Lopes' conduct which was the subject of the Maryland proceeding likewise involved neglect and dishonesty. The facts of the four cases are briefly summarized below.

A. *The original disciplinary proceedings.*

1. *Correia.*

On August 30, 1990, Lawrence Correia retained Lopes to represent him in an employment discrimination matter. On January 11, 1991, Lopes filed a complaint on Correia's behalf in the United States District Court for the District of Columbia. The defendant subsequently filed a motion for summary judgment. On December 21, 1993, in a supplemental opposition to this motion, Lopes submitted an affidavit on which he had signed Correia's name and

had attempted to reproduce Correia's signature. Mr. Correia was not in the District of Columbia when the affidavit was executed and, contrary to a representation in the affidavit, he did not personally appear before the notary. In his testimony before the Hearing Committee, Lopes maintained that he had not intended to mislead the court by signing his client's name. He claimed that all of the information in the affidavit was true, and that it had been provided, and later confirmed, by Mr. Correia.

Although Lopes' pleadings and motions in Correia's case were repeatedly filed at least a few days late, they were all accepted by the court without sanction or admonition. Lopes failed to respond in timely fashion to discovery requests, and the defendant ultimately filed a motion to compel the plaintiff to respond. In October 1994, when Lopes belatedly answered the defendant's interrogatories, he signed his client's name to the responses without disclosing that the signature was not Correia's. According to his testimony before the Hearing Committee, Lopes believed that he was authorized to sign his client's name to the answers.

In March 1995, Mr. Correia attempted to mail a document to Lopes at Lopes' business address. Lopes had moved from his office without notifying his client, and Correia's letter was returned undelivered. In March 1995, Correia's discrimination case was decided adversely to Correia. Having failed to notify the court of his change of address, Mr. Lopes did not receive a copy of the court's decision. Mr. Correia ultimately learned of the court's disposition of his case by contacting the judge's chambers.

2. *Freeman.*

Evelyn Freeman retained Lopes in March 1994 in connection with her respon-sibilities as personal representative of a decedent's estate. The estate owned certain rental property, and Ms. Freeman sought Lopes' assistance in evicting tenants from the property for non-payment of rent and in securing a quitclaim deed. Ms. Freeman paid Lopes a retainer of $775, of which $600 represented advance payment for the eviction and $175 was intended to be compensation for obtaining the deed. Thereafter, Lopes rarely contacted his client, and he did not return her telephone calls. Ms. Freeman became increasingly disenchanted with Lopes' representation, and on October 31, 1994, she wrote a letter to Lopes in which she terminated the relationship and requested a refund of $175. Lopes told the Hearing Committee that he did not recall receiving Ms. Freeman's letter. During Bar Counsel's investigation, Lopes agreed to refund Ms. Freeman's entire legal fee, but he had not done so as of the date of the hearing.

An ethical complaint arising out of Lopes' representation of Ms. Freeman was docketed on February 12, 1996. Bar Counsel mailed the complaint to Lopes on February 21, 1996, and requested a response by March 2, 1996. Lopes did not respond to the complaint. Lopes also ignored a subsequent follow-up letter from Bar Counsel, as well as Bar Counsel's eventual motion to compel and an order of the Board directing a response. Lopes ultimately submitted a response on September 3, 1996, more than half a year after the complaint had been mailed to him.

Following several unsuccessful attempts by Bar Counsel to serve Lopes with a subpoena for his office file and to secure his cooperation, a process server succeeded in accomplishing service. As of the date of the Hearing Committee Report, Lopes had failed to comply with the subpoena.

### 3. *Byers.*

On or about June 1, 1995, Andrea Byers retained Lopes to represent her and her two sisters in connection with the administration of the estate of their deceased mother. The sisters sought Lopes' assistance in securing a copy of the deed of a house, which was the estate's sole asset. Ms. Byers paid Lopes a retainer fee of $1,200. Lopes did not provide the Byers sisters with a retainer agreement setting forth the basis for the fee or the rate at which Lopes would charge his clients.

Lopes belatedly delivered letters of administration to his clients five months after he had agreed to do so. He never obtained a copy of the deed. He failed to keep his clients informed about the status of their case. He was tardy in responding to the Byers sisters' inquiries and, in some instances, he did not respond at all. Lopes' first substantive action on his clients' behalf was to file a petition for probate. This initial step was not taken until May 1, 1996, two weeks after a disciplinary complaint against him had been docketed.

On May 7, 1996, Lopes filed a notice of appointment purportedly signed by his clients. In fact, the purported signatures were written by Lopes. An expert witness called by Bar Counsel testified before the Hearing Committee that Lopes had attempted to simulate the sisters' signatures. Lopes had not been authorized by the Byers sisters to sign their names to the documents. As in the *Correia* matter, however, Lopes claimed to believe that his clients would not have objected.

A disciplinary complaint based on Lopes' representation of Ms. Byers and her sisters was docketed on April 18, 1996. As in the *Freeman* matter, Lopes initially ig-

nored the complaint. On August 12, 1996, at the request of Bar Counsel, the Board entered an order directing Lopes to file a response. On August 29, 1996, Lopes finally did so. He stated, *inter alia,* that all filings in the case had "been accomplished." In fact, the inventory for the estate was overdue. In this matter, as in the *Freeman* case, Lopes failed to comply with a subpoena for his original office file.

### B. *The reciprocal discipline matter.*

In the Maryland proceeding, Lopes acknowledged that he had neglected a matter involving a foreclosure on real estate purchased at a tax sale. He further admitted that he had not responded accurately or in timely fashion to requests for information from his client, that he had misrepresented the status of the legal matter to the client and to the Maryland Attorney Grievance Commission, and that he had failed to cooperate in the disciplinary investigation.[1]

On October 22, 1997, the Maryland Court of Appeals entered an order, by consent, suspending Lopes from practice in that jurisdiction for a period of ninety days. Reinstatement was conditioned upon Lopes' payment of $1,000 to the Client Security Trust Fund and upon Lopes' engagement of a practice monitor, who was to make regular reports to Bar Counsel for two years following Lopes' readmission. On July 29, 1998, Lopes was reinstated in Maryland, but he did not remain in good standing for long. On November 13, 1998, less than four months after his readmission, Lopes was suspended from practice once again, this time for failure to comply with the conditions of his reinstatement. It appears that Lopes had failed to make the required payment to the

---

1. Lopes' misconduct in Maryland occurred during the same approximate period as his misconduct in the District.

Client Security Trust Fund and had not secured a court monitor to supervise his practice. Lopes attributes his noncompliance to shortage of funds. So far as we are aware, Lopes remains under suspension in Maryland.

### C. *Lopes' suspension from practice in the District of Columbia.*

On December 18, 1997, following the imposition of discipline in Maryland, this court suspended Lopes from practice in the District and referred the reciprocal matter to the Board. On January 20, 1998, Bar Counsel filed a statement with the Board recommending the imposition of reciprocal discipline. Bar Counsel advised the Board that Lopes had not filed an affidavit as required by Rule XI, § 14(g). Bar Counsel therefore proposed that any period of suspension that might be imposed as reciprocal discipline should not be deemed to have begun, for purposes of Lopes' eligibility for reinstatement, until Lopes had complied with that requirement. Lopes filed the § 14(g) affidavit on July 29, 1998.

### D. *The Hearing Committee's report.*

On April 23, 1998, after having received extensive testimony, the Hearing Committee issued its Report on the three District of Columbia complaints against Mr. Lopes. The Committee found that Lopes had violated numerous disciplinary rules, as follows:

Rules 1.3(a) and (c) (neglect) in all three cases;

Rule 1.4 (a) (failure to communicate) in all three cases;

Rule 1.16 (a)(2) (failure to withdraw due to physical impairment) in all three cases;

Rule 8.4 (c) (dishonesty, fraud, deceit, and misrepresentation) in two of the three cases (*Correia* and *Byers* );

Rule 3.3v (a)(1) (false representation of material fact to a tribunal) in two cases (*Correia* and *Byers* );

Rule 4.1v (a) (false statement of material fact to a third person) in one case (*Correia* );

Rule 8.4 (d) and D.C.App.R. XI, § 2(b)(3) (conduct seriously interfering with administration of justice) in two cases (*Freeman* and *Byers* );

Rules 1.1(a) and 1.1(b) (incompetence) in two cases (*Freeman* and *Byers* );

Rule 1.4 (b) (failure to explain matter sufficiently to permit client to make an informed decision) in one case (*Byers* );

Rule 3.4 (d) (failure to comply with legally proper discovery requests) in one case (*Correia* ); and

Rule 1.5 (b) (failure to provide writing setting forth basis or rate of fee) in one case *(Byers* ).

The Hearing Committee also determined, however, that Lopes had satisfied the requirements for mitigation of sanction set forth in *In re Kersey,* 520 A.2d 321 (D.C.1987). The Committee relied on evidence that Lopes suffered from a combination of serious health problems, including sarcoidosis (a chronic disease which interfered with his breathing), multiple sclerosis, depression, and certain severe side effects of prescription medication. In the Committee's view, all of Lopes' misconduct, *including forgery and other dishonest acts,* was causally related to these disabling conditions. The Committee recommended that Lopes be suspended for sixty days, but that his suspension be stayed and that he be placed on probation for one year, with certain proposed conditions, including, *inter alia,* payment of restitution to Ms. Freeman and completion of a course in Continuing Legal Education. On April 28, 1998, Bar Counsel filed an exception to the Hearing Committee's recom-

mendation, and the forum for the dispute shifted from the Committee to the Board.

### E. *Proceedings before the Board on Professional Responsibility.*

In a Report and Recommendation issued on June 25, 1999, the Board adopted the findings of the Hearing Committee with respect to Lopes' violations of the various disciplinary rules. The Board also agreed with the Hearing Committee's recommendation that Lopes' sanction should be mitigated in conformity with *Kersey* and its progeny, but only with regard to Lopes' neglect of client matters and related violations. The Board was of the opinion that Lopes' conduct involving dishonesty was not related to any of his disabilities and that *Kersey* principles did not apply to these violations.

The Board disagreed with the Hearing Committee's recommendation as to the appropriate sanction. Based on Lopes' misconduct in the original matters and in the reciprocal discipline case, the Board recommended that Lopes be suspended from practice for six months, and that, for purposes of eligibility for reinstatement, the six-month period should begin to run on July 29, 1998, the day on which he filed the affidavit required by § 14(g). The Board further recommended, without objection from Lopes, that the suspension be followed by a two-year period of probation, with the following conditions:

(i) Lopes' supervising physician (or, if no physician was available, Lopes himself) would be required to report to the Board twice a year on Lopes' medical condition;

(ii) if Lopes accepted any clients during the probationary period, he would be required to notify the Board, and a practice monitor would be appointed; and

(iii) if Lopes failed to comply with the conditions of his probation, or if the Board determined that Lopes' physical or emotional condition had rendered him unable to practice law competently, Lopes' probation would be revoked, and he would be suspended from practice until he could demonstrate fitness.

The Board further proposed that Lopes be required to make restitution to Ms. Freeman and to the Byers sisters.

On July 26, 1999, Bar Counsel moved this court to remand the case to the Board for further consideration of the sanction. On September 13, 1999, this court granted Bar Counsel's motion and remanded the case. On April 7, 2000, following further briefing by the parties, the Board issued a supplemental Report and Recommendation in which it adhered in all respects to its original recommendation. The Board declined to propose any change in the sanction or in the conditions of probation that it had recommended in June 1999.

## II.

## LEGAL ANALYSIS

Bar Counsel takes issue with the Board's recommendation in two respects. First, according to Bar Counsel, "the Board erred in concluding that [Lopes] established *Kersey* style mitigation for any of his multiple instances of misconduct." Second, Bar Counsel challenges the recommended discipline; she asserts that Lopes should be required, at the conclusion of the six-month suspension recommended by the Board, to demonstrate his fitness for the practice of law. In the alternative, if the court declines to require proof of rehabilitation, then Bar Counsel asks us to impose conditions of probation more exacting and more intrusive than those proposed by the Board.

## A. The standard of review.

■ In conformity with the applicable rule of court, our review of the Board's findings and recommendations is deferential:

In determining the appropriate order, the [c]ourt shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.

D.C.App.R. XI, § 9(g)(1). The quoted rule "endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise." *In re Goffe,* ·641 A.2d 458, 464 n. 7 (D.C.1994) (per curiam) (quoting *In re Haupt,* 422 A.2d 768, 771 (D.C.1980) (per curiam)). The Board's recommended discipline comes to the court with a strong presumption in favor of its imposition. *Goffe, supra,* 641 A.2d at 463 (citing *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc)). "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Goffe, supra,* 641 A.2d at

463–64. "We must therefore, at the very least, accord respectful consideration to the Board's views." *In re Marshall,* 762 A.2d 530, 536 (D.C.2000).

## B. Kersey mitigation.

■ In order to qualify for a reduced sanction under the *Kersey* doctrine, Lopes was required to demonstrate

(1) by clear and convincing evidence that he had a disability;

(2) by a preponderance of the evidence that the disability substantially affected his misconduct; and

(3) by clear and convincing evidence that he has been substantially rehabilitated.

*See, e.g., In re Stanback,* 681 A.2d 1109, 1114–15 (D.C.1996). As Bar Counsel correctly states in her brief, "it was incumbent upon [Lopes] to show that his illnesses, however labeled, deprived him of the meaningful ability to comport himself in his professional conduct in accordance with the basic norms of professional responsibility."

■ The *Kersey* issues have been vigorously contested before the Hearing Committee and the Board, and they have been ably briefed in this court. Without reciting in detail all of the relevant testimony,[2]

---

**2.** The Hearing Committee heard testimony concerning Lopes' disability from Norman McKoy, M.D., Lopes' treating physician; from Lopes himself; and from Richard Ratner, M.D., a psychiatrist who examined Lopes on behalf of Bar Counsel. Dr. McKoy described Lopes' illnesses in some detail and explained that Lopes was "depressed about his physical condition and the possibility of ultimate paralysis," and also about his domestic situation. He observed that Lopes suffered from "fatigue, memory loss, confusion and disorientation, occurring for relatively short periods every two to three months." Dr. McKoy stated that Lopes' condition had significantly improved since late 1996.

Lopes testified, *inter alia,* that as a result of the fatigue and pain resulting from his multiple sclerosis and from his reactions to Prednisone and Prozac, he sometimes suffered from loss of memory and from confusion. By 1995, he was barely able to work, and his law practice had "basically kind of shut down." Lopes was unable, at that time, to pay for health insurance. His condition improved significantly, however, following a change of medication for multiple sclerosis.

Dr. Ratner conceded the possibility that Lopes had been suffering from depression at the time of the charged violations, but he found it significant that Lopes was able to function effectively in many cases during the same period. Dr. Ratner was skeptical of

we are satisfied, upon careful consideration of the record as a whole, that the Board's analysis and recommendation are reasonable and consistent with our precedents. Under these circumstances, we must defer to the findings of the Board.

We begin our consideration of this issue with the first element of Lopes' burden under *Kersey*. It is substantially undisputed that, at the relevant times, Lopes was suffering from depression,[3] a disability that has been held to warrant *Kersey* mitigation. *See, e.g., In re Peek*, 565 A.2d 627, 631–32 (D.C.1989). Bar Counsel and counsel for the Board have energetically debated whether Lopes' depression was comparable to the depression suffered by the respondents in *Peek* and in some of our other cases. In our view, however, there was clear and convincing evidence to support the Board's finding that Lopes' depression, together with his reactions to Prednisone and Prozac and his extreme fatigue and other symptoms, amounted to a disability cognizable under *Kersey*. We must therefore sustain that finding.[4]

With respect to *Kersey's* causation prong, Lopes claims, and the Hearing Committee found, that Lopes' various infirmities substantially caused all of his misconduct, including not only his neglect of his clients' matters, but also his acts of dishonesty and forgery in the *Correia* and *Byers* cases. The Board agreed with the Hearing Committee in part:

> [A]s to the neglect and related misconduct, there was evidence that [Lopes']

combined ailments "substantially affected" his misconduct. As the Hearing Committee noted, "Respondent testified that, due to his health problems, he could not get out of bed to do work, he did not return phone calls on a timely basis, he filed pleadings late, and failed to respond to Bar Counsel in a timely manner." HC Report at 39. The Hearing Committee found it "self-evident that Respondent's health problems, both physical and the resulting mental effects, were devastating to him and imposed an enormous burden of pain and uncertainty on his life. It is hardly a surprise that Respondent's law practice would suffer as a result."

The Board found no evidence, however, that Lopes' ailments "caused him to forge signatures on documents he filed with the court." The Board continued:

> [W]e are not satisfied that Respondent's conclusion that there was a causal link between the Prednisone and his dishonesty is supported by the medical and other evidence in this case. Respondent's conclusion that Prednisone "causes people to have bad judgment" appears to be an inference from Dr. McKoy's testimony that the side effects of Prednisone include depression, confusion, disorientation and transient amnesia. We do not find that evidence sufficient to conclude that those side effects "caused" Respondent's dishonesty.
>
> Dishonesty cuts away at the heart of the legal profession. We are not inclined to diminish the seriousness of that

Lopes' claim that his ethical violations were causally connected to his physical or mental condition. Dr. Ratner pointed out that Lopes was employed as an attorney by the District of Columbia government when he failed to respond to Bar Counsel's complaints and inquiries.

3. As previously noted, Dr. Ratner, while somewhat dubious in regard to Lopes' claims,

acknowledged the possibility that Lopes' condition included depression.

4. To the extent that Lopes' eligibility *vel non* for *Kersey* mitigation, while heavily factbound, may be viewed as presenting an underlying question of law, we discern no legal error by the Board.

misconduct by relying on too tenuous a link between dishonesty and physical or psychological impairments. The physical and psychological impairments under which Respondent labored undeniably were extremely difficult. We agree with the Hearing Committee that the picture Respondent painted of what he felt and experienced for a number of years was credible and sympathetic. There is no evidence, however, that the physical and psychological impairments, separately or in combination, either rendered Respondent unable to understand that he was being dishonest or unable to behave otherwise. Absent such evidence, we cannot conclude that the ailments were "sufficiently determinative of his conduct" to support a *Kersey* defense. *See In re Temple*, 596 A.2d 585, 590 (D.C. 1991).

We are satisfied that the Board's analysis of causation issues was comprehensive, balanced, thoughtful, and rational. We so conclude even though it was the Hearing Committee, and not the Board, that heard the witnesses. We agree entirely with the Board's refusal to apply *Kersey* to Lopes' "dishonesty" violations, but we also find substantial support in the record for the Board's finding that Lopes demonstrated the requisite causal nexus between his disabilities and his neglect and related violations.

In its initial Report, the Board also sustained the Hearing Committee's finding on *Kersey's* third element, namely, that Lopes had presented sufficient evidence of rehabilitation:

Finally, the Committee found clear and convincing evidence of Respondent's rehabilitation. The Committee noted the

testimony that Respondent was not then suffering from depression and had been stable since September 1996. In addition, Respondent had developed an awareness of his illness and the connection between his medical problems and his ability to perform professionally, so that he was unlikely to allow problems to go untreated or to take on more than he could handle.

In its supplemental report, issued following this court's remand, the Board elaborated:

The evidence now available concerning Respondent's employment, access to health care and physical and mental condition all indicate that Respondent is doing all he can to maintain his health, that he is in good shape physically and mentally and that if he wants to practice law again, he will be able to do so successfully.

Although we are troubled by Lopes' failure to comply with the conditions of his reinstatement in Maryland, which soon resulted in a second suspension, we cannot say that the quoted findings lack substantial support in the record.

### C. The sanction.

 The Board, as we have noted, has recommended a six-month suspension, *nunc pro tunc* to July 29, 1998, followed by two years of probation, with specific recommended conditions. Bar Counsel agrees that a six-month suspension is appropriate, and she has not objected to the *nunc pro tunc* feature. Lopes' counsel has intimated that such a suspension is too harsh, but she has not excepted to it. Substantially for the reasons stated by the Board,[5] we conclude that the recom-

---

5. In its initial Report, the Board stated:

Respondent's misconduct in the original cases involves several acts of dishonesty, coupled with numerous instances of neglect and

related failings and failure to cooperate with Bar Counsel. Sanctions for dishonesty range generally from 30 days suspension to disbarment. When the dishonesty is coupled with

mended period of suspension falls well "within a wide range of acceptable outcomes," *Goffe, supra,* 641 A.2d at 463–64.

The Board and Bar Counsel are in sharp disagreement over the Board's recommendation that the six-month suspension be followed by a period of probation. Bar Counsel proposes, instead, that Lopes be required to demonstrate that he has been rehabilitated, *i.e.,* to prove "fitness," before being readmitted to the practice of law. District of Columbia Bar Rule XI, § 3(a)(2) provides in relevant part that "[a]ny order of suspension may include a requirement that the attorney furnish proof of rehabilitation as a condition of reinstatement." In determining whether a "fitness" condition should be imposed, this court has considered

> (1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

*In re Chisholm,* 679 A.2d 495, 503 (D.C. 1996) (quoting *In re Steele,* 630 A.2d 196, 201 (D.C.1993)) (quoting *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985)). The foregoing five criteria have come to be known as the *Roundtree* factors.

The question whether Lopes should be required to demonstrate rehabilitation as a condition of reinstatement is not an easy one. In *In re Reback, supra* note 5, two attorneys, Reback and Parsons, had filed a verified complaint for divorce on behalf of their client, but they had failed to bring the case to issue within six months. The court dismissed the complaint for want of prosecution pursuant to Super. Ct.Dom. Rel.R. 41(b). The respondents prepared a second verified complaint but, instead of asking the client to sign the new pleading before a notary—a course of action which would have revealed their neglect and the dismissal of the first complaint—Reback forged the client's signature. Parsons, knowing of the forgery, which had been carried out in his presence, filed the second complaint in the Superior Court. The new complaint was subsequently also dismissed pursuant to Rule 41(f), and the client eventually learned that her signature had been forged by her own attorneys. Bar Counsel initiated disciplinary proceedings, and the case ultimately came before this court sitting en banc.

---

other violations, the sanction tends at least toward the middle of that range. *See, e.g., In re Rosen,* 481 A.2d 451 (D.C.1984) (30–day suspension for three misrepresentations to the court); *In re Phillips,* 705 A.2d 690 (D.C. 1998) (per curiam) (60–day suspension for conviction for submitting inaccurate petition for legal fees); *In re Reback,* 513 A.2d 226 (D.C.1986) (en banc) (6–month suspension for refiling divorce complaint, dismissed due to neglect, by forging the client's signature and having it falsely notarized); *In re Gil,* 656 A.2d 303 (D.C.1995) (disbarment for "extremely serious acts of dishonesty" and criminal conduct amounting to theft); *In re Goffe,* 641 A.2d 458 (D.C.1994) (per curiam) (disbar-

ment for "egregious misconduct" including a pattern of dishonesty and lying and blatant fabrication of evidence). Taking into account all of Respondent's misconduct, we conclude that a six-month suspension is appropriate.

\* \* \* \* \* \*

It is not clear from the Maryland Order and accompanying papers exactly when the misconduct in Maryland occurred. It appears, however, that it was roughly during the same time period as the misconduct in this jurisdiction. We think the recommended sanction adequately accounts for the Maryland misconduct as well as the misconduct in this jurisdiction.

The en banc court suspended both respondents for six months. All of the members of the court agreed that suspension from practice was appropriate, but the court was divided on the question whether the respondents should be required to prove rehabilitation as a condition of reinstatement. The majority declined to require proof of fitness:

If we were persuaded that protection of the public, the courts, and the profession required that respondents be removed from practice until some later time at which they could establish that they are fit for reinstatement, we would impose a suspension of over one year; a suspension of that length would not terminate automatically when its term had run, but would require respondents to reapply for permission to practice. D.C. Bar R. XI, § 21(1), (5).

513 A.2d at 233.

Three judges disagreed with the majority's disposition. Chief Judge Pryor voted to suspend both respondents for one year, but he would not have required proof of fitness. Judge Terry, with whom Judge Newman joined, believed that both attorneys should be suspended for a year and a day—a suspension which would have triggered the fitness requirement then in effect. *Id.* at 234–35.[6]

At least in some respects, the misconduct in *Reback* was even more serious than that of Lopes in the present case. The purpose of the forgery and false notarization effected by Reback and Parsons was plainly to conceal respondents' neglect from their own client; no such purpose is evident in the present case. In any event, the en banc court's holding in *Reback* that

a proof of fitness requirement should not be imposed supports the Board's proposed disposition here.

This court again encountered a case involving both neglect and dishonesty in *In re Chisholm, supra. Chisholm* involved an attorney's neglect of a client's immigration matter. That neglect resulted in the client's "needless incarceration" by the Immigration and Naturalization Service. *Chisholm,* 679 A.2d at 503. The Board found that the respondent had engaged in "persistent, intentional dishonesty," *id.,* and noted that the Hearing Committee had disbelieved some of the respondent's sworn testimony. The Board recommended that the respondent be suspended from practice for six months, but concluded that a "fitness" requirement was not appropriate. This court disagreed:

This is a case in which the Hearing Committee and the Board found both protracted neglect and extensive dishonesty. Such a combination has warranted severe sanctions. *See [In re] Stanton,* 470 A.2d [272] 280 [(D.C.1983) (per curiam)] (citing authorities). Considering the number of disciplinary rules that Chisholm violated, the severity of his misconduct, the fact that it was intentional, his protracted and continuing dishonesty, his refusal to accept responsibility for his actions, his lack of contrition, and the Hearing Committee's assessment of Chisholm's condition and character, we are convinced that Chisholm should be required to demonstrate his fitness to practice as a precondition to reinstatement.

*Id.* at 505. It is evident from the foregoing, however, that *Chisholm* was a more extreme case than *Lopes,* both in the ex-

---

6. At the time *Reback* was decided, D.C. Bar R. XI, § 3(a)(2) authorized the court to require proof of fitness only when an attorney was suspended for more than one year. *See Chisholm, supra,* 679 A.2d at 503 n. 13. The rule has since been amended to permit the inclusion of a fitness requirement whenever an attorney has been suspended for any period. *Id.*

tent of the respondent's dishonesty and in terms of the harm done to the client.

No two cases are alike, and the present one has similarities to, and differences from, both *Reback* and *Chisholm.* After giving careful consideration to these decisions and to the authorities cited to us by counsel, we conclude that the Board's recommendation in this case—that no showing of fitness should be required—was reasonable.[7] Moreover, although the Board has recommended a six-month suspension, Lopes has now been suspended from practice in the District for more than three years pending the resolution of his case.[8] Procedures for proving rehabilitation are time-consuming. The imposition of a fitness requirement in this case would further prolong Lopes' suspension, which has already been six times as long as the period recommended by the Board. Under all of the circumstances, we adopt the Board's recommendation.[9]

## III.

## CONCLUSION

For the foregoing reasons, Joseph A. Lopes is suspended from practice for a period of six months, *nunc pro tunc* to July 28, 1998. Lopes shall not, however, be permitted to resume the practice of law in the District until the Board has issued an order placing him on probation for two years and containing other provisions as set forth herein, and until Lopes has agreed in writing to the terms of that order. The conditions of probation shall be those set forth in the Board's initial Report and described on pages 9–10 of this opinion. The Board's order shall also conform in all respects with the requirements of D.C. Bar R. XI, § 3(a)(7).[10]

In the order to be issued in compliance with our decision, the Board shall also require Lopes to make full restitution to Ms. Freeman and the Byers sisters, *see* D.C. Bar R. XI, § 3(b), with interest at the legal rate. The order shall include a reasonable payment schedule and shall specify the precise amounts to be paid by Lopes on each date of payment and the manner in which payment shall be made. Although we decline to prescribe a certain date by which restitution shall be completed, the court contemplates that this should be accomplished as promptly as possible.

---

7. We do not suggest, however, that a contrary recommendation would have been unreasonable.

8. Some seven months of the three years—the period between the Board's two reports—are attributable to Bar Counsel's request to this court to remand the case to the Board following the Board's initial report. We do not criticize Bar Counsel for making the request, but we note that Lopes' *de facto* suspension was thereby prolonged through no fault of his own.

9. Bar Counsel argues that even if a fitness requirement is not imposed, the conditions of probation should be more exacting than those proposed by the Board. To the limited extent that we believe that modifications are appropriate, those modifications are reflected in Part III of this opinion.

10. The discipline authorized by § 3(a)(7) includes, *inter alia:*

Probation imposed by the Court, or imposed by the Board with the consent of the attorney and the approval of the Court, for not more than three years. Probation may be imposed in lieu of or in addition to any other disciplinary sanction. Any conditions of probation shall be stated in writing in the order imposing probation. The order shall also state whether, and to what extent, the attorney shall be required to notify clients of the probation. The Board by rule shall establish procedures for the supervision of probation. Violation of any condition of probation shall make the attorney subject to revocation or probation and the imposition of any other disciplinary sanction listed in this subsection, but only to the extent stated in the order imposing probation.

The Board's order shall also set forth the mechanics of compliance with the conditions of probation and the procedures to be followed in the event of an alleged violation of the terms of probation or of the conditions of reinstatement. Finally, the Board's order shall provide that, if Lopes fails to agree to the terms of probation or restitution, or if, following the entry of the Board's order, Lopes violates those terms, then he shall be promptly suspended from practice and shall be required to prove fitness as a condition of reinstatement to the practice of law.[11]

*So ordered.*

11. In determining the form and content of the order to be issued pursuant to our decision, the Board may, of course, request the input of Bar Counsel and of counsel for Lopes.