**In re John H. MIDLEN, Jr., Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

No. 04–BG–808.

District of Columbia Court of Appeals.

Argued Oct. 18, 2005.

Decided Nov. 10, 2005.

---

John T. Rooney, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, was on the brief, for the Office of Bar Counsel.

Mark S. Carlin, Washington, for respondent.

Before SCHWELB and FARRELL, Associate Judges, and NEBEKER, Senior Judge.

FARRELL, Associate Judge:

The Board on Professional Responsibility (the Board), rejecting the contrary determination by a Hearing Committee, concluded that respondent John H. Midlen, Jr. (Midlen) had misappropriated client funds within the meaning of Rule 1.15(c) of the Rules of Professional Conduct.[1] Because the Board also concluded that he had done so recklessly, it recommends that he be disbarred. *See In re Addams,* 579 A.2d 190 (D.C.1990) (en banc).[2] The Board's conclusion and recommendation stem from Midlen's representation of an entity known as Jimmy Swaggart Ministries from 1991 until 1998, during which time he repeatedly deducted his attorney's fees from royalty payments destined for JSM but distributed to and held by Midlen as escrow agent. In its principal ruling, the Board found that Midlen had paid himself these fees despite the fact that, at least as of late 1994, a "dispute" between himself and JSM under Rule 1.15(c) had arisen concerning both the amount of fees Midlen was billing and his right to deduct them from the distributed royalties. The Board found these deductions to be reckless, because they "evidenced a conscious indifference to the consequences of his actions and to his client's legitimate interest in the entrusted funds."

We agree with the Board that Midlen misappropriated funds entrusted to him. He repeatedly deducted fees from the escrowed royalty payments when he could not reasonably have doubted that JSM disputed his entitlement to the fees, a situation that imposed on him the duty to keep the funds "separate ... until the dispute [was] resolved." Rule 1.15(c). We do not agree, however, with the Board's conclusion of recklessness. In light of what the Board admits was a "complex factual history," including conflicting actions and signals by a client whose own conduct the Hearing Committee, with record support, found to be characterized by bad faith, and the fact that Midlen's ultimate entitlement to the fees he deducted is not questioned, his conduct did not rise to the level of intentional or reckless misappropriation

---

**1.** The Hearing Committee, not crediting some of the testimony on behalf of the client (on matters we deem essentially immaterial), had rejected the charge of misappropriation. It found only that Midlen had violated Rules 1.4(a) and 1.15(b) (failure to provide a prompt accounting), and recommended that he be informally admonished.

**2.** The Board found additionally that Midlen had violated Rules 1.4(a) and (b), 1.15(b), 1.16(d), and 8.4(c) (dishonesty), the latter based partly—but not entirely—on the misappropriation of funds.

warranting disbarment under the *Addams* rule. We nevertheless agree with the Board that Midlen's misconduct, in the aggregate, was serious and requires a lengthy period of suspension. We accept the Board's "alternative [recommended] sanction" and suspend him from the practice of law for eighteen months.

## I.

█ Midlen began a private practice of law in 1970 and later formed a partnership with Gregory Guillot under the name Midlen & Guillot, Chartered (M & G). In 1991, M & G was retained by Jimmy Swaggart Ministries (JSM), which produces and broadcasts religious programs that air on various cable television outlets. M & G was retained by JSM to represent it in the cable royalty distribution process, a creature of federal law by which the Librarian of Congress distributes royalties to copyright owners. The distribution process has two phases. In the first phase, royalties are allocated among eight designated "claimant" groups (including the Devotional Group, of which JSM was a member); in the second, payments are allocated within each claimant group. If the members of the claimant group agree on an allocation, they sign an agreement (a Settlement Agreement) specifying the distribution, otherwise they litigate the proper allocation.[3]

The 1991 retainer agreement between Midlen's firm and JSM provided that services generally would be billed on an hourly basis and that JSM was expected to make "full and prompt payments of the amounts invoiced." M & G agreed, however, "at least for the 1990 [royalty] claim period, ... to allow [JSM] to pay only our out-of-pocket expenses until such time as the royalties actually are distributed." Once that happened—*i.e.*, when 1990 distribution checks were sent to M & G as escrow agent, see note 3, *supra*—M & G would "deduct the fees incurred as of that date for professional services rendered" and "forward[ ] the balance to [JSM]."

In July 1991, and for each July thereafter until 1997, Midlen filed a claim with the Library of Congress on JSM's behalf for royalties earned in the preceding year. In 1992, after deducting its attorney's fees and expenses from the first distribution for the 1990 claim period, M & G sent the rest of those funds to JSM. In September 1993, M & G sent JSM a second disbursement check for that claim period, pointing out that its legal fees had been deducted from this distribution as well. An accompanying spreadsheet stated that a balance of $10,009.22 was being "reserved," *i.e.*, not disbursed, by M & G. JSM informed Midlen that it would not consent to M & G holding this "reserve"; it reminded him that costs other than out-of-pocket expenses were to be reimbursed to M & G "when [royalty] funds are disbursed—not escrowed against." JSM said nothing in opposition to the two fee deductions M & G had taken from the distributed funds. Midlen forwarded the $10,009.22 to JSM.

In late 1994, JSM's Chairman of the Board of Directors, Clyde Fuller, wrote Midlen expressing concern about the amounts being billed in light of the results achieved. Near the end of December 1994, Midlen informed JSM that his legal fees would be deducted from the upcoming 1991 royalty distribution. Although it appeared that JSM owed M & G substantial overdue fees, Fuller objected to the deductions in several phone conversations. On

3. Midlen had acted as agent for the Devotional Group escrow account (to which royalty payments are initially distributed) since at least 1991, and was still serving in that capacity at the time of the disciplinary hearing.

December 27, 1994, JSM instructed Midlen in writing that "no attorneys' fees are to be withheld from the proceeds. In other words, the entire amount disbursed is to be sent to us and we will, in turn, reimburse your firm when an amount is agreed upon." When Midlen objected to these instructions as contrary to the retainer agreement, JSM fired him.[4]

Nevertheless, a few days later the claimants in JSM's group reached a settlement enabling JSM to receive a 1991 distribution, and JSM rehired Midlen—in order, Frances Swaggart of JSM testified, to insure that JSM obtained this money. On or around January 3, 1995, JSM received a distribution from M & G from which Midlen had withheld $20,000 in attorney's fees and costs. JSM made no objection to this deduction. In late January 1995, Midlen and Guillot dissolved their partnership and Midlen formed his own law firm. In a letter, he proposed that JSM continue its relationship with him on the same basis as before, and JSM accepted, remaining with him because, as Frances Swaggart testified, "his fees were lower than" Guillot had proposed in similarly offering to represent JSM. At this time, too, JSM raised no questions about Midlen's deductions of fees from royalty payments or the size of his fees.

On August 18, 1995, however, Mrs. Swaggart sent a letter to Midlen stating that JSM "continued to disagree with [him] concerning [his] billings over the past two years and that the matter must be resolved." The letter complained that his last bill was "ridiculous" and directed him to "list the hours you work for us plus state the charge per hour." It continued:

> You also know that we do not give and we have not given you permission to deposit any royalties into your account, delete your expenses, and remit the balance to us. Instead, we have consistently instructed you to send the full amount of royalties received to us and we will remit payment to you. However, that remittance will only be when we feel we are being charged the correct amounts for the work done and your invoices are in the format requested.

A second letter to Midlen from Barry Miller, an attorney for JSM, in October 1995 reiterated the request that Midlen itemize the hours spent on each daily service referenced in his bills. Miller further expressed his belief that JSM had not authorized Midlen to deduct legal fees directly from royalty disbursements, a practice "particularly problematic since there may be a dispute concerning your bills." Midlen answered the October letter by proposing different formats for his bills and by reminding Miller of the original engagement letter. "Given the Ministry's payment history," Midlen wrote, "the one thing that is not negotiable is that I remit anything to JSM while leaving payment of my legal fees to some future agreement and compensation."

In March and May 1996, Midlen notified JSM that distributions would soon be issued for the 1992 and 1993 claim periods, but that JSM's share would be insufficient to cover his unpaid legal fees. On multiple occasions after 1996 and through 1997, Midlen received royalties on JSM's behalf but failed to notify it of the distributions. This prompted Miller in August 1996 to write to Midlen requesting an accounting, because "it appears that you did receive some distributions and that you, without authorization of the Ministries, applied

---

4. Both the Hearing Committee and the Board concluded that Midlen had been fired at this point although—as the Board stated—"the exact circumstances [of the termination] are not clear from the record."

them to payment of your legal fees which we still question." In October 1996, Miller again wrote Midlen asking for "an accounting of all sums which have been collected to date and the disbursal of such sums." A year later in October 1997, Midlen wrote JMS a letter admitting that he had failed so far to provide "an accounting for monies received and disbursed since May 1996," and promising to furnish one.

Another lawyer for JSM, Frank Koszorus, met with Midlen in November 1997 and again asked for an accounting of monies received on JSM's behalf. In December, when Koszorus repeated the request for a "full, detailed and intelligible accounting of the royalty sums," Midlen twice replied by admitting that the accounting he owed JSM was not completed. On or about February 9, 1998, JSM terminated Midlen's services and directed him promptly to deliver all files concerning JSM to Koszorus. Pointing to unanswered inquiries about its bills, JSM again told Midlen that he was not authorized to withdraw money from the sums held on JSM's behalf. During February and March 1998, a flurry of correspondence ensued in which JSM asked for the accounting and for its files, and Midlen requested more time to finish the accounting. On April 29, 1998, he sent JSM the final accounting which identified all royalty disbursements JSM had been entitled to and all escrow funds applied to unpaid legal fees from June 1996 to April 1998. Midlen did not turn over the JSM files until months later.

Previously, on October 31 and December 30, 1997, Midlen had written himself checks from his escrow account for $6,628.63 and $5,602.32, respectively, to pay down JSM's outstanding legal fees. He did not deposit either check until September 1998, after his services had been terminated and he had rendered the final accounting.

Altogether, Midlen had disbursed to JSM approximately $341,000 in royalty payments between 1992 and 1997, and paid himself some $123,000 in fees and costs during the same period. (JSM made direct payments to him, ending in 1994, of approximately $52,000). The Board found "no evidence on the record that Midlen took more [in attorney's fees and costs] than was his due."

## II.

As explained earlier, the principal violations the Board found were misappropriation and dishonesty, the latter based partly on the misappropriation. "The most serious issues presented by this case," the Board stated, "concern [Midlen's] practice of withdrawing disputed legal fees from cable royalty payments he received on his client's behalf." Specifically, the Board inquired "whether [Midlen] could properly deduct his fees from these funds in the face of: (i) JSM's repeated demands that all the royalty payments be delivered to JSM; (ii) JSM's specific directives that [Midlen] was not to take payments for legal fees from these funds; (iii) JSM's repeated complaints about the quantum of [Midlen's] fees; and (iv) JSM's repeated requests for an accounting of fees withdrawn and royalties paid." The Board concluded that, on the facts presented, Midlen had misappropriated entrusted funds in violation of Rule 1.15(c). We agree.

Rule 1.15 provides in relevant part:

(a) A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property.

\* \* \* \* \* \*

(c) When in the course of representation a lawyer is in possession of property in which interests are claimed by the lawyer and another person, or by two or more persons to each of whom the lawyer may have an obligation, the property shall be kept separate by the lawyer until there is an accounting and severance of interests in the property. If a dispute arises concerning the respective interests among persons claiming an interest in such property, the undisputed portion shall be distributed and the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

Rule 1.15(a) & (c). As the Board pointed out, neither subsection—(a) or (c)—uses the word "misappropriation." Our decisions, however, have defined the term as "any unauthorized use of [a] client's funds entrusted to the lawyer," *In re Anderson*, 778 A.2d 330, 335 (D.C.2001) (citation omitted), and Rule 1.15, among other things, proscribes the conduct that constitutes misappropriation. In this jurisdiction, charges of misappropriation arise most often under Rule 1.15(a). Indeed, until this case there have been only two reported decisions regarding the obligations of an attorney when "a dispute arises concerning the respective interests among persons claiming an interest in ... property," Rule 1.15(c): *In re Haar*, 667 A.2d 1350 (D.C. 1995) (*Haar I*), and *In re Haar*, 698 A.2d

412 (D.C.1997) (*Haar II*).[5] Nevertheless, we stated in *Haar I* that "[t]he rule is unambiguous: an attorney may not withdraw a portion of ... deposited funds when the attorney's right to receive that portion is 'disputed' by the client." 667 A.2d at 1353. In *Haar II*, we made clear that when what is disputed is the lawyer's entitlement to funds that presently or potentially belong to a client, a lawyer who withdraws the funds before the dispute is resolved has committed misappropriation. *See* 698 A.2d at 417–18 ("To the extent the withdrawal [from a joint lawyer-client account] 'is disputed by the client,' there is, necessarily, a [Rule 1.15(c) ] misappropriation.").[6] Moreover, in *Haar I* we rejected the notion that any dispute over fees has to be "genuine": "[t]here is no requirement that the dispute be 'genuine,' 'serious,' or 'bona fide' .... [T]he word 'dispute' means [merely] 'to argue about;' to debate; to question the truth or validity of; [or] to doubt." 667 A.2d at 1353 (quoting THE AMERICAN HERITAGE DICTIONARY 380 (1976)).

Midlen's principal argument to the court is that there was never a fee dispute within the meaning of Rule 1.15(c), because (1) his original retainer agreement with JSM authorized him to deduct attorney's fees from distributed royalties, and (2) JSM periodically "re-authorized" him to pay himself in that manner.[7] On the record

---

**5.** Both of these decisions involved the predecessor Disciplinary Rule (DR) 9–103(A)(2), different in language from, but identical in meaning to, Rule 1.15(c).

**6.** *Haar II*, acknowledging the intervening rule change, noted:

The current version of Rule 1.15(c) makes clear that the lawyer shall not take his or her claimed share of a fund in which lawyer and client each claim an interest until there has been an "accounting and severance of interests in the property," and that any portion of the fund "in dispute shall be

kept separate by the lawyer until the dispute is resolved."
698 A.2d at 418 n. 6.

**7.** Midlen preliminarily argues that the Board wrongly substituted its own fact-finding for that of the Hearing Committee. He cites almost no specifics in this regard, however, and our comparison of the Board's statement of the evidence with the Committee's reveals that, for the most part, the differences were over "ultimate facts"—essentially "conclusions of law," *In re Micheel*, 610 A.2d 231, 234 (D.C.1992)—or (what may be the same thing) were different characterizations of the

summarized, and in light of the principles outlined, that argument is unavailing. The retainer agreement is hardly a model of clarity. It deferred payment of attorney's fees "at least for the 1990 claim period" until the royalties had been distributed, at which point M & G would deduct its outstanding fees before forwarding the balance. It thus left ambiguous whether the same procedure would govern disbursements for succeeding claim periods. Initially, JSM raised no objection when Midlen twice deducted fees from payments for the original claim period (protesting only his plan to keep a "reserve" against future fees earned), but by the end of 1994, JSM began questioning B & G's entitlement to continue that practice. Whether, even under Rule 1.15(c)'s undemanding test for a "dispute," a disagreement over the practice of deducting fees had arisen at that point is probably unclear. Despite its repeated oral and written instructions to Midlen in late 1994 not to deduct fees, JSM did not object when he again deducted $20,000 in fees from a January 1995 distribution for the 1994 claim period; and on dissolution of his partnership, it retained him again while mindful of his understanding that "[t]here [would] be no change in any of the arrangements as to [their] relationship."

Nevertheless, by August 1995 JSM was emphatically disagreeing with Midlen's "billings over the past two years," challenging the format of the bills and instructing him "to send the full amount of royalties received to us and we will remit payment to you." Two attorneys for JSM, Miller and then Koszorus, repeated the demands for itemization of time spent and disbursement of royalties without fee deduction on occasions from late 1995

through early 1998, when Midlen's services were terminated. There also began, and continued throughout that period, a succession of demands by JSM for a complete accounting of the distributed royalties and the fees and expenses Midlen had billed. Consequently, by September 1998 when Midlen withdrew from the escrow account attorney's fees totaling more than $12,000, it could not have escaped his knowledge that (as an August 1996 letter put it) this was "without authorization of [JSM]" and that JSM disputed his entitlement to the fees. That dispute, which did not have to be " 'genuine,' 'serious,' or 'bona fide,' " *Haar I,* 667 A.2d at 1353, imposed on Midlen the duty to "k[eep] separate" the funds in which both he and JSM "[claimed] interests" until "the dispute [was] resolved." Rule 1.15(c). He plainly did not do so.

Midlen argues that in finding misappropriation the Board "abrogated the retainer agreement" between JSM and himself, and that if JSM's "attempt to alter the existing fee arrangement were to rise to the level [of a fee dispute under Rule 1.15(c),] no engagement letter or agreement would be worth the paper it is written on" (Br. for Midlen at 21, 26). But aside from the ambiguity of the retainer agreement we have noted, this assertion confuses contract law with an attorney's duties under Rule 1.15, which, as the Board and the Hearing Committee both recognized, arise because the lawyer has a fiduciary relationship with the client, rather than from the operation of a contract between them. *See In re Ryan,* 670 A.2d 375, 380 (D.C. 1996) ("[A]ny supposed failure of a client to fulfill a retainer agreement is no defense to a disciplinary charge against an attorney.") As in *Haar,* Midlen may have

---

basic facts. The handful of instances where the Board may be said to have disregarded findings by the Board are not, in our view,

material—except in a single instance mentioned in Part III, *infra,* where Midlen receives the important benefit of that finding.

had a "charging lien" on funds deposited in the escrow account to the extent JSM owed him outstanding legal fees and expenses, *see Haar II*, 698 A.2d at 416, but at the time he withdrew attorney's fees from the account—certainly by the time he did so in late 1998—his entitlement to the funds was in dispute. *See Haar I*, 667 A.2d at 1355. The fact that, as it turned out, he was contractually entitled to more than the amounts he withdrew "does not change the nature of the disagreement . . . because at the moment [he] withdrew [the funds, the client] had not acknowledged he had earned and was entitled to at least that amount." *Id.* at 1353. Midlen misappropriated client funds under Rule 1.15(c).

### III.

■ At the same time, we do not accept the Board's recommendation of disbarment, even though, as will be apparent, we agree with the Board that Midlen's conduct in the aggregate warrants a lengthy period of suspension. When an attorney is found to have committed misappropriation, the discipline required by our decisions almost invariably is disbarment if the attorney acted intentionally or recklessly in appropriating the client funds. *See Addams*, 579 A.2d at 191. Recklessness, which the Board found here, requires proof at a minimum that the attorney handled entrusted funds "in a way that reveals . . . conscious indifference to the consequences of his behavior for the security of the funds." *Anderson*, 778 A.2d at 339.[8] Bar Counsel must prove that degree of culpability by clear and convincing evi-

dence. *Id.* at 337. He has not done so in this case.

■ To begin with, since the twin *Haar* decisions, this is only the first case to reach the court in which misappropriation arose from a dispute about ownership of entrusted funds and failure to segregate them under Rule 1.15(c). (*Haar I* and *II* were issued in 1995 and 1997, respectively, midway through or toward the end of Midlen's relationship with JSM.) Disputed ownership thus distinguishes this case from those in which the court has found reckless (or worse, intentional) misappropriation because the lawyer had engaged in concealment or similar acts demonstrating that he clearly knew the funds did not belong to him, *see, e.g., In re Berryman*, 764 A.2d 760 (D.C.2000); *Addams, supra*, or because a court order to return the fee unmistakably had given him such notice. *See In re Utley*, 698 A.2d 446 (D.C.1997).[9] Equally significant, Midlen's entitlement to the fees he withdrew is ultimately not challenged. As the Board acknowledged, "there is no evidence on the record that Midlen took more than his due. Indeed, JSM eventually made further payments to him in settlement of his suit against it." Rule 1.15(c) does not allow an attorney to gamble that his claim to ownership of funds will be upheld, but Midlen's ultimate entitlement to the fees is evidence, nevertheless, that he was not acting with "conscious indifference to the . . . security of the [entrusted] funds." *Anderson, supra.*

Further evidence of this fact is the disagreement itself between the Board (unan-

---

8. *See also* BLACK'S LAW DICTIONARY 1277 (7th ed.1999) (recklessness is a "state of mind in which a person does not care about the consequences of his or her action") (quoted in *In re Romansky*, 825 A.2d 311, 316 (D.C. 2003)).

9. This is not to say that a dispute over ownership of funds—resulting in a Rule 1.15(c) rather than a Rule 1.15(a) violation—insulates an attorney without more from a finding of reckless misappropriation. As will be apparent, our conclusion that Midlen was not reckless follows from the combination of factors we cite in this part of the opinion.

imously) and the Hearing Committee (also unanimously) about whether there had been a fee dispute under Rule 1.15(c). The Committee found that JSM's expressions of dissatisfaction had not gone beyond "requests for information" about Midlen's billing practices ("[r]equests for information about prior bills cannot add up to a dispute over fees"), and that, in any event, JSM's actions in 1994 and again in 1996—specifically its "months of silence" in not answering Midlen's communications about their fee arrangements—amounted to "abandonment" of any fee dispute JSM had had with him. The Board found these conclusions unsupported by the record, and so do we; at least by April 1998, Midlen could not reasonably have doubted that JSM was questioning the amount of his fees and his right to deduct them, thus triggering his duty to segregate the disputed funds. Still, the Board described what it termed a "factually complex" interaction between Midlen and JSM, and the record shows the message of JSM's complaints to have been mixed, sometimes appearing chiefly to be about the manner in which he itemized the work he was billing. Not until mid–1995 did JSM first state its objection to his withdrawal of fees. But more importantly, the Hearing Committee made a finding that should not be ignored. Based on the testimony of JSM's own witnesses, the Committee found that "J.S.M.'s questions about the fees charged by [Midlen] were not raised in good faith," both because JSM was claiming inability to pay Midlen while it "was paying a biweekly payroll of thousands of dollars" and because, when JSM's business began "struggling," it "sometimes delayed payments to all vendors out of concern for its financial survival." (*See also* the Board's Report at 64, noting record support for the Hearing Committee's finding that a portion of JSM's conduct was "possibly . . . a way for JSM to delay its payment of legal bills to

him.") These findings support the reasonableness of Midlen's belief, immaterial to whether there was a "dispute" but relevant to his culpability, that JSM was not genuinely disputing either his fees or his deduction of them from the royalties. Having reason to question the *bona fides* of JSM's complaints, in other words, Midlen was not reckless—he was not indifferent to the security of entrusted funds—by deducting attorney's fees that he correctly believed he had earned.

To summarize, Midlen was negligent in taking funds he should have segregated pending resolution of his dispute with JSM, but his actions did not reflect the heightened culpability that disbarment for misappropriation requires. The Board wishes its recommendation in this case to "serve as a warning to lawyers who have financial differences with demanding clients and are prompted to resort to self-help to resolve those differences." That lesson will be conveyed here even if, as we conclude, Midlen's misconduct does not deserve the severest disciplinary sanction the law provides.

## IV.

We accept the Board's alternative conclusion that Midlen's misappropriation, combined with the other violations he committed, warrants suspension for a considerable period of time. Chiefly, the Board concluded that Midlen had breached his duty under Rule 1.15(b) to provide timely accountings upon request, and that he had engaged in dishonesty. Except as explained below, we agree with both of these conclusions.

 Upon JSM's request, Midlen was required by Rule 1.15(b) to notify it of the receipt of royalty payments and to render a prompt accounting of any monies he had

received.[10] Although Midlen received funds on behalf of JSM several times between May 1996 and December 1997, and though he promised no later than October 1996 to provide "an accounting for monies received and disbursed since May 1996," he furnished no accounting until April 23, 1998. As the Board concluded, "[t]his inexcusable one-and-a-half year delay in supplying the accounting was most certainly not the prompt accounting required by Rule 1.15(b)." Midlen resists that conclusion by arguing that the rule requires an accounting only with respect to funds that the client "is entitled to receive," and that, as any cable royalty distributions JSM received after the accounting was requested did not cover his unpaid legal fees, he had no duty to account for them. The Hearing Committee—in agreement with the Board on this point—correctly rejected that argument:

> The lawyer's duty *to account for the funds* exists independently of the lawyer's duty to *distribute the funds*. The Rule requires the lawyer to render a prompt accounting upon request from a client and does not condition the accounting on the client's right to receive the funds. Put another way, the client has the right to *know* what funds the lawyer holds on behalf of the client even where the client may not ultimately receive the funds. [ (Emphasis in original.) ]

Midlen may have doubted JSM's right to the funds or even the sincerity of its requests for information, but that did not excuse his failure to provide the timely accounting Rule 1.15(d) requires.[11]

Beyond the violation of that rule, the Board found—and we agree—that Midlen separately violated Rule 1.16(d) when, after JSM terminated his services in February 1998, he failed to deliver JSM's files to successor counsel and, once again, failed to furnish a prompt accounting. As the Board explained:

> On the day that [Midlen's] services were terminated, [attorney] Koszorus requested JSM's files. The record contains four subsequent written requests for transfer of the files . . . . We believe retaining client files for seven months after termination was patently unreasonable . . . . Indeed, we note [Midlen] did not return JSM's files until after he had notice of JSM's complaint to Bar Counsel. . . . [Moreover,] JSM [had] terminated [Midlen's] services because he failed to provide [an accounting]. . . . His delay in providing an accounting, or even the most rudimentary financial information, was unreasonable in light of the fact that it had been repeatedly requested both before and after his termination.

The Board concluded further that Midlen had engaged in dishonesty within the meaning of Rule 8.4(c). In part that conclusion rested on the finding that Midlen's misappropriation of disputed funds was

---

10. Rule 1.15(b) states:
 Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full ac-

counting regarding such property, subject to Rule 1.6.

11. We reject Midlen's textual argument, employing the "rule of the last antecedent," that only funds the client ultimately "is entitled to receive" need be accounted for. That would condition the client's right to learn what claim he has to the funds on proving beforehand his entitlement to them—which assuredly is not what the rule contemplates.

reckless, *see Romansky*, 825 A.2d at 316–17 ("a showing of recklessness can sustain a violation of ..." Rule [8.4(c)]; "[i]f Romansky violated the fee agreements ... recklessly—*i.e.*, consciously disregarding the risk that the agreements did not permit premium billing—then his conduct was dishonest"), a conclusion we have rejected. But the Board's finding of dishonesty rested on other conduct as well, which so far we have omitted from our summary of the evidence. This was conduct regarding an Addendum Midlen executed on JSM's behalf in 1997. The Board set forth the relevant facts and its reasons for concluding that Midlen's actions concerning the Addendum were dishonest. We agree with that conclusion and, in the following, adopt that portion of the Board's report, except to delete record citations and change "respondent" to "Midlen":

> In October of 1997, Midlen informed JSM that it was necessary to amend the Devotional Claimants' 1992–93 Settlement Agreement because one of the other claimants had failed to file a claim in the royalty proceeding. In a fax to JSM on November 12, Midlen reported on the status of this proceeding and attached a proposed draft Addendum. On November 14, JSM informed Midlen that it needed time to review the matter and that Midlen was not authorized to execute or sign any document on its behalf until JSM informed him of its decision. Midlen offered to answer any questions regarding the Addendum. He also reminded JSM that the Addendum did not make any substantive changes to the earlier agreement.

> Thereafter, JSM advised Midlen that Frank Koszorus would be contacting him regarding the Addendum and reminded him that "the directives given to you in our letter of November 14, 1997, are still in effect." Midlen met with Koszorus, who indicated that he understood the Addendum and did not have any questions for Midlen. On December 12, Midlen forwarded the final version of the Addendum to JSM and advised it that the final version would go forward the following week. The same day, Reverend (Jimmy) Swaggart responded to this letter, advising Midlen that he could only execute the Addendum for JSM "when you have authorization in writing to do so from myself or Frances—not before." The next day, Midlen replied to this letter noting that Koszorus had not raised any objections to the Addendum and that JSM had not raised any specific problems or questions. Midlen's letter did not advise JSM that he intended to execute the Addendum over JSM's objection.

> Midlen executed the Addendum on December 16, 1997. Shortly, thereafter, Midlen received a letter from Koszorus, dated December 16, reiterating JSM's directive that Midlen was not to execute the Addendum without written permission from JSM. Midlen neither replied to this letter nor took action to withdraw JSM's assent to the Addendum. JSM did not learn that Midlen had executed the Addendum until April 1998.

\* \* \* \* \* \*

■ What is clear from the record is that at the time Midlen signed the Addendum his client had informed him on three separate occasions that he was not authorized to do so. Moreover, Midlen's actions after signing the Addendum were not consistent with the actions of a lawyer who honestly believed he had the authority to sign this document. Midlen did not tell his client that he had signed the Addendum. He did not send his client a copy of the signed Addendum. The day after the Addendum was signed, JSM wrote again and restated

its objection. Midlen did not reply to this letter by telling his client that he had already executed the agreement....

"[D]ishonesty," includes "conduct evincing 'a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness.'" *In re Shorter*, 570 A.2d 760, 767–68 (D.C.1990) (*quoting Tucker v. Lower*, 200 Kan. 1, 434 P.2d 320, 324 (1967)). Only the most general of these types of misconduct—dishonesty—need be shown to establish a violation of Rule 8.4(c). *Id.* at 767. Dishonesty includes a failure to disclose a material fact when there is a duty to do so. *In re Reback*, 487 A.2d 235, 239–40 (D.C.), *vacated by*, 492 A.2d 267 (D.C.1985), *and aff'd in relevant part*, 513 A.2d 226 (D.C.1986) (en banc) (citation omitted).

Here, Midlen (i) executed the Addendum in direct contravention of his client's instructions; and (ii) failed to tell his client that he had taken this action, even though he had several opportunities to do so.... [T]his conduct evidences a lack of honesty, probity, and integrity, and th[u]s violated Rule 8.4(c).

## V.

 Accepting the Board's alternative recommendation, we suspend Midlen for eighteen months. He committed misappropriation by deducting attorney's fees from disputed funds entrusted to him; he thus "accorded a higher priority to the collection of his fee than to ... complying with professional standards." *In re James*, 452 A.2d 163, 170 (D.C.1982). He compounded that misconduct by repeated instances of failure to provide a timely accounting, and by signing, and then not disclosing that he had signed, a document without the client's authorization—conduct evincing dishonesty under our decisions. The Board's recommendation is within the range of sanctions for combined ethical violations of this kind. *See, e.g., In re James, supra* (two-year suspension for violations including dishonesty, commingling, and conflict of interest); *In re Lopes*, 770 A.2d 561, 570 n. 5 (D.C.2001) (endorsing Board's understanding that sanctions for dishonesty range generally from thirty days to disbarment, and that "[w]hen the dishonesty is coupled with other violations, the sanction tends at least toward the middle of that range"). D.C. Bar R. XI, § 9(g) requires this court to "enforce a general sense of equality in the sanctions [administered], but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable." *In re Haupt*, 422 A.2d 768, 771 (D.C.1980). The Board's alternative recommendation satisfies that standard.

Accordingly, John H. Midlen, Jr., is hereby suspended from the practice of law in the District of Columbia for eighteen months.

*So ordered.*