911 A.2d 852

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

John H. MIDLEN, Jr.

Misc. Docket AG No. 4, Sept. Term, 2006.

Court of Appeals of Maryland.

Dec. 4, 2006.

Glenn M. Grossman, Deputy Bar Counsel (Melvin Hirsh-man, Bar Counsel, Atty. Grievance Com'n), for petitioner.

Mark S. Carlin, Washington, DC, for respondent.

Argued before BELL, C.J. RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE, JJ.

Opinion by WILNER, J.

This is a reciprocal discipline case governed by Maryland Rule 16–773. In April, 2006, Bar Counsel, having learned that, in November, 2005, the District of Columbia Court of Appeals had found that respondent, John Midlen, Jr., violated certain D.C. Rules of Professional Conduct (DCRPC) and had suspended him from the practice of law for a period of eighteen months, filed a petition seeking reciprocal discipline in Maryland. The petition, filed pursuant to Maryland Rule 16–773(b), alleged that, based on the findings of the D.C. Court, Midlen had violated Maryland Rules of Professional Conduct (MRPC) 1.15 (safekeeping property in which a client has an interest), 1.16 (requirements upon termination of representation), and 8.4(a), (c), and (d) (violating other MRPC; engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation that is prejudicial to administration of justice).

In accordance with Rule 16–773(c) we issued an order directing the parties to show cause why, based on any of the grounds set forth in Rule 16–773(e), corresponding discipline should not be imposed. Both parties responded to that order. Mr. Midlen's principal response was (1) that the suspension by the D.C. Court of Appeals violated his right to due process of law in that the court, by adopting the recommendation of its Board of Professional Responsibility, effectively discarded the factual findings of the Hearing Committee that had been appointed to consider the complaint of the D.C. Bar Counsel, findings which, in Mr. Midlen's view, were binding on the court, and (2) that the eighteen month suspension conflicted with sanctions imposed by this Court for comparable violations. We find no merit in Midlen's response, but shall examine the manner in which the reciprocal sanction should be implemented.

To address Midlen's response, it is necessary to understand both the procedure for resolving disciplinary complaints in the District of Columbia and the nature of the charges filed against him in that jurisdiction. We described the disciplinary

procedure in the District in *Attorney Griev. Comm'n v. Parsons,* 310 Md. 132, 138–39, n. 6, 527 A.2d 325, 328, n. 6 (1987), and it appears from the current D.C. Bar Rules that the procedure there has not changed substantially since then. In addition to Bar Counsel, whose duties are to receive and investigate complaints and prosecute disciplinary proceedings, there are three layers to the disciplinary process—the Court of Appeals itself, at the top, a nine-person Board of Professional Responsibility appointed by the court, and a three-person Hearing Committee appointed by the Board.

A disciplinary case is prosecuted first before a Hearing Committee, which is charged with conducting an evidentiary hearing on Bar Counsel's petition in accordance with rules adopted by the Board. Within 60 days following the hearing, the Committee submits to the Board a report containing its findings and recommendation, together with a record of its proceedings. If no exceptions are filed to the report, the Board may decide the case on the basis of the Hearing Committee record. If exceptions *are* filed, the Board schedules the matter for submission of briefs and oral argument. Promptly after oral argument or, if there is no oral argument, after reviewing the Hearing Committee record, the Board may "adopt or modify the recommendation of the Hearing Committee, remand the case to the Hearing Committee for further proceedings, direct Bar Counsel to issue an informal admonition, or dismiss the petition." D.C.Bar Rule XI, § 9(c). Unless the Board dismisses the petition, remands the case, or concludes the case by a reprimand or direction for informal admonition, the Board prepares a report containing *its* findings and recommendation. That report is transmitted to the court.

As with the Hearing Committee report, either party may file exceptions to the Board's report. If exceptions are filed, the court schedules the matter for consideration and enters an appropriate order. In determining that order, "the Court shall accept the findings of fact made by *the Board* unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition *of the Board* unless to do

so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar Rule XI, § 9(g). (Emphasis added).

The complaint against Mr. Midlen arose from his representation of Jimmy Swaggart Ministries (JSM), which produced and broadcast religious programs on various cable television outlets. Initially through a law firm, Midlen & Guillot (M & G), Midlen was retained by JSM to represent it in the royalty distribution process, under which, pursuant to Federal law, the Librarian of Congress distributes royalties to copyright owners. As the D.C. Court of Appeals pointed out, the distribution process has two phases. First, royalties are allocated among eight designated claimant groups, one of which was the Devotional Group, of which JSM was a member. In the second phase, payments are allocated to the members of the designated claimant group. If the members of the group agree on an allocation, they sign a settlement agreement specifying the distribution; otherwise, the allocation is litigated.

Though generally eschewing long quotations, we choose to recite the facts underlying the D.C. complaint as stated by the D.C. Court of Appeals, rather than attempt to paraphrase them:

"The 1991 retainer agreement between Midlen's firm and JSM provided that services generally would be billed on an hourly basis and that JSM was expected to make 'full and prompt payments of the amounts invoiced.' M & G agreed, however, 'at least for the 1990 [royalty] claim period, to allow [JSM] to pay only our out-of-pocket expenses until such time as the royalties actually are distributed.' Once that happened—i.e., when 1990 distribution checks were sent to M & G as escrow agent, see note 3, supra—M & G would 'deduct the fees incurred as of that date for professional services rendered' and 'forward [ ] the balance to [JSM].'

In July 1991, and for each July thereafter until 1997, Midlen filed a claim with the Library of Congress on JSM's behalf

for royalties earned in the preceding year. In 1992, after deducting its attorney's fees and expenses from the first distribution for the 1990 claim period, M & G sent the rest of those funds to JSM. In September 1993, M & G sent JSM a second disbursement check for that claim period, pointing out that its legal fees had been deducted from this distribution as well. An accompanying spreadsheet stated that a balance of $10,009.22 was being 'reserved,' i.e., not disbursed, by M & G. JSM informed Midlen that it would not consent to M & G holding this 'reserve'; it reminded him that costs other than out-of-pocket expenses were to be reimbursed to M & G 'when [royalty] funds are disbursed— not escrowed against.' JSM said nothing in opposition to the two fee deductions M & G had taken from the distributed funds. Midlen forwarded the $10,009.22 to JSM.

In late 1994, JSM's Chairman of the Board of Directors, Clyde Fuller, wrote Midlen expressing concern about the amounts being billed in light of the results achieved. Near the end of December 1994, Midlen informed JSM that his legal fees would be deducted from the upcoming 1991 royalty distribution. Although it appeared that JSM owed M & G substantial overdue fees, Fuller objected to the deductions in several phone conversations. On December 27, 1994, JSM instructed Midlen in writing that 'no attorneys' fees are to be withheld from the proceeds. In other words, the entire amount disbursed is to be sent to us and we will, in turn, reimburse your firm when an amount is agreed upon.' When Midlen objected to these instructions as contrary to the retainer agreement, JSM fired him.[1] Nevertheless, a few days later the claimants in JSM's group reached a settlement enabling JSM to receive a 1991 distribution, and JSM rehired Midlen—in order, Frances Swaggart of JSM testified, to insure that JSM obtained this money. On or around January 3, 1995, JSM received a

---

1. Here, the Court noted in a footnote that "[b]oth the Hearing Committee and the Board concluded that Midlen had been fired at this point although—as the Board stated—'the exact circumstances [of the termination] are not clear from the record.' "

distribution from M & G from which Midlen had withheld $20,000 in attorney's fees and costs. JSM made no objection to this deduction. In late January 1995, Midlen and Guillot dissolved their partnership and Midlen formed his own law firm. In a letter, he proposed that JSM continue its relationship with him on the same basis as before, and JSM accepted, remaining with him because, as Frances Swaggart testified, 'his fees were lower than' Guillot had proposed in similarly offering to represent JSM. At this time, too, JSM raised no questions about Midlen's deductions of fees from royalty payments or the size of his fees. On August 18, 1995, however, Mrs. Swaggart sent a letter to Midlen stating that JSM 'continued to disagree with [him] concerning [his] billings over the past two years and that the matter must be resolved.' The letter complained that his last bill was 'ridiculous' and directed him to 'list the hours you work for us plus state the charge per hour.' It continued:

'You also know that we do not give and we have not given you permission to deposit any royalties into your account, delete your expenses, and remit the balance to us. Instead, we have consistently instructed you to send the full amount of royalties received to us and we will remit payment to you. However, that remittance will only be when we feel we are being charged the correct amounts for the work done and your invoices are in the format requested.'

A second letter to Midlen from Barry Miller, an attorney for JSM, in October 1995 reiterated the request that Midlen itemize the hours spent on each daily service referenced in his bills. Miller further expressed his belief that JSM had not authorized Midlen to deduct legal fees directly from royalty disbursements, a practice 'particularly problematic since there may be a dispute concerning your bills.' Midlen answered the October letter by proposing different formats for his bills and by reminding Miller of the original engagement letter. 'Given the Ministry's payment history,' Midlen wrote, 'the one thing that is not negotiable is that I remit

anything to JSM while leaving payment of my legal fees to some future agreement and compensation.'

In March and May 1996, Midlen notified JSM that distributions would soon be issued for the 1992 and 1993 claim periods, but that JSM's share would be insufficient to cover his unpaid legal fees. On multiple occasions after 1996 and through 1997, Midlen received royalties on JSM's behalf but failed to notify it of the distributions. This prompted Miller in August 1996 to write to Midlen requesting an accounting, because 'it appears that you did receive some distributions and that you, without authorization of the Ministries, applied them to payment of your legal fees which we still question.' In October 1996, Miller again wrote Midlen asking for 'an accounting of all sums which have been collected to date and the disbursal of such sums.' A year later in October 1997, Midlen wrote JMS a letter admitting that he had failed so far to provide 'an accounting for monies received and disbursed since May 1996,' and promising to furnish one.

Another lawyer for JSM, Frank Koszorus, met with Midlen in November 1997 and again asked for an accounting of monies received on JSM's behalf. In December, when Koszorus repeated the request for a 'full, detailed and intelligible accounting of the royalty sums,' Midlen twice replied by admitting that the accounting he owed JSM was not completed. On or about February 9, 1998, JSM terminated Midlen's services and directed him promptly to deliver all files concerning JSM to Koszorus. Pointing to unanswered inquiries about its bills, JSM again told Midlen that he was not authorized to withdraw money from the sums held on JSM's behalf. During February and March 1998, a flurry of correspondence ensued in which JSM asked for the accounting and for its files, and Midlen requested more time to finish the accounting. On April 29, 1998, he sent JSM the final accounting which identified all royalty disbursements JSM had been entitled to and all escrow funds applied to unpaid legal fees from June 1996 to April 1998. Midlen did not turn over the JSM files until months later.

Previously, on October 31 and December 30, 1997, Midlen had written himself checks from his escrow account for $6,628.63 and $5,602.32, respectively, to pay down JSM's outstanding legal fees. He did not deposit either check until September 1998, after his services had been terminated and he had rendered the final accounting. Altogether, Midlen had disbursed to JSM approximately $341,000 in royalty payments between 1992 and 1997, and paid himself some $123,000 in fees and costs during the same period. (JSM made direct payments to him, ending in 1994, of approximately $52,000). The Board found 'no evidence on the record that Midlen took more [in attorney's fees and costs] than was his due.' "

*In re Midlen*, 885 A.2d 1280, 1283–85 (D.C.2005).

The Court also recited the facts surrounding Respondent's handling of an addendum to a settlement agreement between the Devotional Claimants:

"In October of 1997, Midlen informed JSM that it was necessary to amend the Devotional Claimants' 1992–93 Settlement Agreement because one of the other claimants had failed to file a claim in the royalty proceeding. In a fax to JSM on November 12, Midlen reported on the status of this proceeding and attached a proposed draft Addendum. On November 14, JSM informed Midlen that it needed time to review the matter and that Midlen was not authorized to execute or sign any document on its behalf until JSM informed him of its decision. Midlen offered to answer any questions regarding the Addendum. He also reminded JSM that the Addendum did not make any substantive changes to the earlier agreement.

Thereafter, JSM advised Midlen that Frank Koszorus would be contacting him regarding the Addendum and reminded him that 'the directives given to you in our letter of November 14, 1997, are still in effect.' Midlen met with Koszorus, who indicated that he understood the Addendum and did not have any questions for Midlen. On December 12, Midlen forwarded the final version of the Addendum to JSM and advised it that the final version would go forward the

following week. The same day, Reverend (Jimmy) Swaggart responded to this letter, advising Midlen that he could only execute the Addendum for JSM 'when you have authorization in writing to do so from myself or Frances—not before.' The next day, Midlen replied to this letter noting that Koszorus had not raised any objections to the Addendum and that JSM had not raised any specific problems or questions. Midlen's letter did not advise JSM that he intended to execute the Addendum over JSM's objection. Midlen executed the Addendum on December 16, 1997. Shortly, thereafter, Midlen received a letter from Koszorus, dated December 16, reiterating JSM's directive that Midlen was not to execute the Addendum without written permission from JSM. Midlen neither replied to this letter nor took action to withdraw JSM's assent to the Addendum. JSM did not learn that Midlen had executed the Addendum until April 1998."

*Id.* at 1291.

The operative complaint was filed in April, 1998, by Frances Swaggart, on behalf of JSM. In that complaint, Ms. Swaggart contended that she had filed an earlier complaint in 1997, of which D.C. Bar Counsel had no record, in which she had complained that Midlen had failed to provide JSM with an accounting of funds collected on JSM's behalf, that he failed to provide JSM with "understandable legal bills," and that he had entered into agreements concerning royalty payments without JSM's knowledge and consent. Neither the 1998 complaint nor Ms. Swaggart's description of the earlier one alleged any particular fee dispute between JSM and Midlen.

Upon the complaint filed by Ms. Swaggart, D.C. Bar Counsel, on December 1, 2000, filed a petition and specification of charges, contending that Midlen had violated the following DCRPC:

Rule 1.3(c), in that Respondent failed to act with reasonable promptness in representing the client;

Rule 1.4(a), in that Respondent failed to keep his client reasonably informed about the status of the matter and

failed to promptly comply with reasonable requests for information;

Rule 1.4(b), in that Respondent failed to explain the matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation;

Rule 1.7(b) & (c), in that Respondent engaged in a likely conflict of interest and failed to provide full disclosure to his client regarding his representation of another client with adverse interests;

Rule 1.15(a), in that Respondent failed to keep complete records of accounts maintained in connection with the representation;

Rule 1.15(b), in that Respondent failed to promptly notify his client upon receiving funds in which the client had an interest, failed to promptly deliver the funds to his client, and failed to promptly provide a full accounting regarding such funds to the client;

Rule 1.15(c), in that Respondent failed to keep separate from his own funds the disputed portion of the funds in which he and the client had an interest;

Rule 1.16(a)(3), in that Respondent continued to represent the client after Respondent had been discharged;

Rule 1.16(d), in that Respondent failed to take timely steps to the extent reasonably practicable to protect the client's interest, by failing to surrender papers and property to which the client was entitled; and

Rule 8.4(c), in that Respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation.

In accordance with the D.C. disciplinary procedure, upon Midlen's denial of Bar Counsel's averments, the matter was referred to a Hearing Committee, which conducted a four-day evidentiary hearing. Nine witnesses, including Midlen, testified, and more than 200 exhibits were placed in evidence. Bar Counsel and Midlen submitted proposed findings of fact and conclusions of law. On October 30, 2002, the Committee filed a 67–page Report and Recommendation, in which it concluded that Midlen had violated DCRPC 1.15(b) "for his failure to

provide a prompt accounting to his client of funds held on behalf of the client," but that Bar Counsel had not sustained her burden of proof with respect to any of the other charges. In support of those ultimate conclusions, the Hearing Committee made 132 specific findings of fact and discussed at some length the various charges. We need consider only two, beyond the Rule 1.15(b) violation—misappropriation arising from Midlen's withdrawal, on seven occasions between January 3, 1995 and December 30, 1997, of an aggregate of $49,000 from his IOLTA account for fees, and the claim that he had acted dishonestly when, in December, 1997, he signed, on behalf of JSM, an addendum to the 1992–93 settlement agreement among the Devotional claimants.

With respect to the claim of misappropriation based on Midlen's withdrawal of funds he regarded as earned fees, the Hearing Committee concluded, first, that Bar Counsel had not actually charged Midlen with "misappropriation" and it therefore disregarded any suggestion that he had engaged in such conduct. The Committee did, then, proceed to rule on the underlying basis of a misappropriation charge by concluding that Midlen was authorized to make the withdrawals. That conclusion rested to a large extent on the Committee's findings that (1) notwithstanding earlier objections about Midlen's deducting fees from royalty distributions, JSM made no objection when, in January, 1995, Midlen withheld $20,000 from a distribution and explained that the withholding was for attorneys' fees; (2) in February, 1995, when M & G dissolved, JSM hired Midlen and again raised no question about his deduction of fees from the cable royalty distribution; (3) notwithstanding correspondence back and forth regarding Midlen's invoices, by the end of 1996, Midlen believed, with ample reason, that JSM had resolved whatever questions it had about his fees and billing format; and (4) that in the alleged complaint JSM filed in April, 1997, which Bar Counsel never received, no dispute was claimed with respect to fees.

Although the Hearing Committee found that there had been fee disputes between JSM and Midlen, it noted that "[h]ere JSM appeared to withdraw its dispute and thus to allow

[Midlen] to follow the practice agreed upon throughout his representation of JSM—that he could withdraw his fees from the cable royalty distributions." It thus concluded that "the fees were no longer disputed when [Midlen] withdrew them." For the Rule 1.15 violation that it found, the Hearing Committee recommended an informal admonition.

Bar Counsel filed an exception to the Hearing Committee's report—to its conclusion that she had failed to meet her burden of proof with respect to the other alleged violations and to the recommended sanction. After a review of the entire record, the Board of Professional Responsibility, on July 15, 2004, rendered its own 77–page Report to the D.C. Court of Appeals. The Board sustained the Hearing Committee's finding that Midlen had violated DCRPC 1.15(b) and concluded further that Bar Counsel had not pursued her alleged violations of DCRPC 1.3(c) and 1.15(b) regarding record-keeping. The Board departed significantly, however, from the Hearing Committee's findings with respect to some of the other alleged violations, noting that its departure "reflects, in our view, a dispassionate reassessment of the entire record." In that regard, the Board concluded that Midlen had violated:

(1) DCRPC 1.15(c) "by misappropriating client funds by failing to keep separate from his own funds the disputed funds in which he and his client had an interest";

(2) DCRPC 1.4(a) and (b) "by failing to respond to requests for information regarding the fees [Midlen] withdrew from his client's disbursements and by failing to inform his client that he executed a settlement";

(3) DCRPC 1.16(d) "by failing to take reasonable steps to protect his client's interest upon termination of the representation, failing to turn over the client's file and by failing to provide a prompt accounting"; and

(4) DCRPC 8.4(c) "by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation."

The Board sustained the Hearing Committee's findings that Bar Counsel had failed to sustain her burden of proof with respect to the other alleged violations.

Relying on Board Rule 13.7 and *In re Micheel*, 610 A.2d 231, 234 (D.C.1992), the Board noted that the Hearing Committee's findings of fact will be affirmed "when supported by 'substantial evidence on the record as a whole' " but, citing several cases from the D.C. Court of Appeals, held that it owed no deference to the Committee's determination of "ultimate facts," such as "whether the facts establish a violation of a Rule, and other conclusions of law." The Board observed that, although the Hearing Committee's findings of fact were "largely supported by the record," it had (1) revised and reorganized some of them for ease in evaluating the violations at issue, (2) added some findings, supported by the record, necessary for a conclusion of law, (3) eliminated certain findings "that are unnecessary to any determination of the outcome," (4) eliminated certain "commentary" from the Committee's findings that "fails to advance the analysis of this matter," and (5) in a few instances, revised or deleted findings that "are not supported by substantial evidence in the record . . . ." Those changes, the Board added, were based on documentary evidence and were made mindful of the deference owed to the Committee's findings.

The Board recognized, as had the Hearing Committee, that the major dispute between the parties concerned whether Midlen had authority to withhold his fees from the royalty payments he received on behalf of JSM. It first made clear that an allegation of misappropriation was implicit in the alleged violation of DCRPC 1.15(c) and that the Committee erred in concluding otherwise. The issue, according to the Board, was whether Midlen was entitled to withhold those fees "in the face of (i) JSM's repeated demands that all the royalty payments be delivered to JSM; (ii) JSM's specific directives that [Midlen] was not to take payments for legal fees from these funds; (iii) JSM's repeated complaints about the quantum of [Midlen's] fees; and (iv) JSM's repeated requests for an accounting of fees withdrawn and royalties paid." The

Board concluded "that under these circumstances, [Midlen] misappropriated client funds in violation of Rule 1.15(c)."

The Board rejected the Hearing Committee's conclusion that JSM's concerns about Respondent's bills were nothing more than requests for information, which could not form the basis of a fee dispute. The Board reasoned:

"JSM repeatedly demanded that all the royalty payments be delivered to JSM and that Respondent not deduct fees prior to such delivery. For example, in a 1995 letter to respondent, Mrs. Swaggart noted 'we have consistently instructed you to send the full amount of royalties received to us and we will remit payment to you.' RX 84. There are several other similar written directives on the record. See, e.g., RX 64, 87, 107. Accordingly, we find that JSM clearly and unequivocally disputed Respondent's entitlement to take outstanding fees from royalty payments.

Second, JSM's repeated complaints about the amount of Respondent's fees are further evidence that his client disputed Respondent's interest in the entrusted funds. We do not agree with the Committee that these complaints were 'vague and non-specific.' HC Report at 55. Although few of these complaints dispute specific amounts or items on the bill, they clearly convey the client's strong view that it was being charged too much for Respondent's services. See, e.g., RX 84, 87, 107. There is no dispute about the fact of these complaints. And once these complaints were made, it was Respondent's responsibility to see that they were resolved before taking any of his fees. He did not do so. Finally, this failure is all the more disturbing in light of JSM's repeated requests for an accounting of the royalties it had earned and the fees that Respondent had deducted from them. From October of 1995 forward, JSM requested such an accounting at least eight times. Respondent did not provide this information until April 1998, and in the interim he continued to receive royalties due to JSM and to deduct his fees from those payments. See Respondent's Proposed Findings at 30–34. We find that these requests for an accounting are clear evidence that JSM questioned Respon-

dent's interest in the royalties that he was holding on its behalf. In light of these facts, it is clear that JSM disputed Respondent's interest in the entrusted royalties."

The Board disagreed with the Hearing Committee's reliance on the retainer agreement between JSM and M & G and the course of conduct between the parties as evidence that Midlen was entitled to take unpaid legal fees from any royalty payment he received on behalf of JSM. It read the retainer agreement as limiting Midlen's right to the withdrawal of fees to the 1990 calendar year and concluded that, even if that agreement could be read to allow Midlen to use cable royalty funds to satisfy his outstanding legal bills, once the client challenged that authority and once the client disputed the bills, he was no longer entitled to withhold fees from the royalty payments. The Board went on to conclude that Midlen's conduct in that regard "evidenced a conscious indifference to the consequences of his actions and to his client's legitimate interest in the entrusted funds." The Board also disagreed with the Committee's conclusion regarding the addendum, reasoning that:

"What is clear from the record is that at the time Respondent signed the Addendum his client had informed him on three separate occasions that he was not authorized to do so. Moreover, Respondent's actions after signing the Addendum were not consistent with the actions of a lawyer who honestly believed he had the authority to sign this document. Respondent did not tell his client that he had signed the Addendum. He did not send his client a copy of the signed Addendum. The day after the Addendum was signed, JSM wrote again and restated its objection. Respondent did not reply to this letter by telling his client that he had already executed the agreement."

Believing Midlen's conduct to be reckless and dishonest, the Board recommended that he be disbarred. It added, however, that, it was dealing with a complex record and that, if the court were to conclude that the misappropriation was not reckless, a suspension of eighteen months would be appropriate.

The D.C. Court of Appeals accepted most of the Board's findings but concluded that Midlen's misappropriation was negligent, rather than reckless, and the court therefore rejected the disbarment recommendation and suspended Midlen for eighteen months. *See In re Midlen, supra,* 885 A.2d 1280. The Court noted Midlen's argument that the Board "wrongly substituted its own fact-finding for that of the Hearing Committee," and responded:

"He cites almost no specifics in this regard, however, and our comparison of the Board's statement of the evidence with the Committee's reveals that, for the most part, the differences were over 'ultimate facts'—essentially 'conclusions of law,' *In re Micheel,* 610 A.2d 231, 234 (D.C.1992)— or (what may be the same thing) were different characterizations of the basic facts. The handful of instances where the Board may be said to have disregarded findings by the Board are not, in our view, material—except in a single instance mentioned in Part III, *infra,* where Midlen receives the important benefit of that finding."

*Id.* at 1286, n. 7. The Court went on to explain its reasoning on why it regarded the record as establishing a fee dispute:

"Midlen's principal argument to the court is that there was never a fee dispute within the meaning of Rule 1.15(c), because (1) his original retainer agreement with JSM authorized him to deduct attorney's fees from distributed royalties, and (2) JSM periodically 're-authorized' him to pay himself in that manner. On the record summarized, and in light of the principles outlined, that argument is unavailing. The retainer agreement is hardly a model of clarity. It deferred payment of attorney's fees 'at least for the 1990 claim period' until the royalties had been distributed, at which point M & G would deduct its outstanding fees before forwarding the balance. It thus left ambiguous whether the same procedure would govern disbursements for succeeding claim periods. Initially, JSM raised no objection when Midlen twice deducted fees from payments for the original claim period (protesting only his plan to keep a 'reserve' against future fees earned), but by the end

of 1994, JSM began questioning B & G's entitlement to continue that practice. Whether, even under Rule 1.15(c)'s undemanding test for a 'dispute,' a disagreement over the practice of deducting fees had arisen at that point is probably unclear. Despite its repeated oral and written instructions to Midlen in late 1994 not to deduct fees, JSM did not object when he again deducted $20,000 in fees from a January 1995 distribution for the 1994 claim period; and on dissolution of his partnership, it retained him again while mindful of his understanding that '[t]here [would] be no change in any of the arrangements as to [their] relationship.'

Nevertheless, by August 1995 JSM was emphatically disagreeing with Midlen's 'billings over the past two years,' challenging the format of the bills and instructing him 'to send the full amount of royalties received to us and we will remit payment to you.' Two attorneys for JSM, Miller and then Koszorus, repeated the demands for itemization of time spent and disbursement of royalties without fee deduction on occasions from late 1995 through early 1998, when Midlen's services were terminated. There also began, and continued throughout that period, a succession of demands by JSM for a complete accounting of the distributed royalties and the fees and expenses Midlen had billed. Consequently, by September 1998 when Midlen withdrew from the escrow account attorney's fees totaling more than $12,000, it could not have escaped his knowledge that (as an August 1996 letter put it) this was 'without authorization of [JSM]' and that JSM disputed his entitlement to the fees."

*Id.* at 1286–87.

The Court also rejected Midlen's argument that the retainer agreement authorized his actions, concluding that "this assertion confuses contract law with an attorney's duties under Rule 1.15, which, as the Board and the Hearing Committee both recognized, arise because the lawyer has a fiduciary relationship with the client, rather than from the operation of a contract between them." *Id.* at 1287 (citation omitted). The Court nonetheless concluded, however, that the misappropria-

tion was not reckless due to the admitted ambiguity in the message JSM was seeking to convey and the one factual finding that the Board disregarded in the Court's view; that the dispute was not in good faith. *Id.* at 1289. On March 30, 2006, the court denied Midlen's motion for rehearing *en banc.*

Midlen's response to this Court's order to show cause is largely a repetition of the arguments he made to the D.C. Board and the D.C. Court. His due process argument rests on the allegation that the D.C. Court "discard[ed] in their entirety the factual findings the Hearing Committee made, substituting [the Board's factual findings]." He complains that "the [Board] reviewed the written record and *sua sponte* found new facts, ignoring all aspects exculpatory of Midlen" and "ignored the Committee's credibility findings." He did not, however, identify any specific facts relied upon by the Board or the Court that were not also found by the Committee, nor does he elaborate on how the credibility issues were implicated. His other argument was that the eighteen month suspension was too harsh under Maryland law.

Bar Counsel responded that the D.C. Court of Appeals had already addressed the issue of whether the Board inappropriately disregarded the factual findings of the Commission and that Midlen had failed to identify any specific instances of such factual disregard other than the "ultimate fact" or "conclusion of law" that there existed a fee dispute. Bar Counsel also asserted that the punishment was appropriate under Maryland case law.

■ We agree with Bar Counsel that the due process argument is without merit. Apart from the fact that the D.C. Court of Appeals competently considered and rejected the same argument, Midlen fails before us, as he did in the D.C. Court, to point out any new and different specific fact-finding by the Board or the court. As we have indicated, the Hearing Committee made 132 specific findings of fact and then determined that the facts it found did not establish that there was a fee dispute, which lay at the heart of the misappropriation complaint. The Board and the Court of Appeals concluded

that those same facts *did* establish a fee dispute. Every fact relied upon by the Board and the Court of Appeals to establish a fee dispute is contained in the findings of fact of the Hearing Committee, and, as the D.C. Court held, no deference is due to the Hearing Committee's ultimate legal conclusion of whether those facts establish the existence of a fee dispute. *In re Appler*, 669 A.2d 731, 738 (D.C.1995); *In re Micheel, supra,* 610 A.2d at 234. The question of whether a fee dispute existed constitutes such an ultimate fact, because of its legal consequence. *See In re Micheel, supra,* 610 A.2d at 234–35 (holding that the question of whether a misappropriation was negligent is an ultimate fact).

■ There remains the matter of the appropriate sanction for the offenses. Maryland Rule 16–773 is captioned "Reciprocal discipline or inactive status," and we often refer to cases in which we are asked to respond to disciplinary rulings in other States as "reciprocal discipline" cases. The actual text of Rule 16–773 sometimes uses the term "reciprocal discipline" but also uses the term "corresponding discipline." *See* Rule 16–773(c), (e), and (f). There is no inconsistency in the use of those terms. Rather, when placed in context, they simply indicate that, ordinarily, "reciprocal" discipline should "correspond" to the discipline to which we are asked to give reciprocity. That is most clear from Rule 16–773(e), which lists circumstances under which it would be inappropriate to order "corresponding" discipline. Indeed, Bar Counsel's petition asks for "corresponding" discipline, and his recommendation, in response to our show cause order, is that this Court enter an order suspending Midlen from practicing law in Maryland for eighteen months. If we were to accept that recommendation, as we shall, we would need to determine how it should be implemented: should it be entirely concurrent with the period of suspension in the District of Columbia or should it be at least partly consecutive? We have not addressed that issue before.

The sanction imposed by the D.C. Court took effect December 10, 2005, which means that it will likely end in June, 2007.

If we were to impose an eighteen month suspension and have the suspension commence from the date of our mandate, which is the normal and traditional approach with respect to suspensions, the suspension would run until June or July, 2008. That is one option. The discipline is reciprocal and corresponding in that is for the same length of time and thus would reflect this Court's view that the conduct engaged in by Midlen warrants that he be suspended for a period of eighteen months. On the other hand, while the period would be comparable in length, it would not be comparable in duration. Midlen would remain suspended in Maryland for more than a year after his suspension ended in the District, for conduct committed in the District.

If we were assured that Midlen had not practiced law in Maryland following his D.C. suspension, we might consider imposing an eighteen month suspension and making it retroactive to December 10, 2005, so that it could run entirely concurrently with the D.C. suspension. That, too, would be corresponding and reciprocal and would reflect our view that Midlen's conduct warrants an eighteen month suspension. We cannot do that on the record now before us, however, because the record is silent with respect to whether Midlen engaged in the practice of law in Maryland following his suspension in the District of Columbia. If there is any prospect that he did so, we cannot make our suspension retroactive, as that might have the impermissible effect of retroactively making unlawful conduct that, when engaged in, was lawful.

A third approach is to achieve the objective of the second approach by imposing a suspension that would commence upon the issuance of our mandate and end when the suspension ordered in the District ends. That would be reciprocal and corresponding in terms of the duration of the period that Midlen is precluded from practicing law, but would not be corresponding in terms of the actual length of the Maryland suspension, as it would be for a period much shorter than eighteen months. That approach could, moreover, in some circumstances, reward an attorney for not promptly reporting an out-of-State suspension to Maryland Bar Counsel or engag-

ing in obstructive and delaying tactics once Bar Counsel becomes aware of the suspension.

Neither the Maryland Rules nor the ABA Model Rules of Professional Conduct and Model Rules for Lawyer Disciplinary Enforcement explain, in the case of a suspension for a set period of time, whether the "same" or "identical" or "reciprocal" or "corresponding" sanction should be an entirely concurrent suspension or a prospective suspension of equivalent length running from the date of the latter court's disposition. *See* Model Rules for Lawyer Disciplinary Enforcement 22(D) (stating that generally a court should impose an "identical discipline or disability inactive status" but not elaborating on what that means in the case of a suspension). A number of courts, including the D.C. Court of Appeals, when confronting this issue, have concluded that, *in appropriate circumstances,* concurrent suspensions are preferable.

In *Matter of Goldberg,* 460 A.2d 982 (D.C.1983), the court had before it an order from this Court suspending an attorney for 30 days. *See Attorney Griev. Com'n v. Goldberg,* 292 Md. 650, 441 A.2d 338 (1982). The suspension under our order took effect March 25, 1982. The attorney, who was also admitted to practice in the District, immediately reported the suspension to D.C. Bar Counsel, who presented the matter to the Board of Professional Responsibility. The Board recommended that the attorney be suspended for 30 days. The court, reviewing the Board's recommendation, agreed that a 30–day suspension was appropriate, but considered, as a matter of first impression, how to structure the suspension. D.C. Rule XI, § 19(3) required that suspension orders take effect 30 days after entry, and the question was whether that rule applied to reciprocal suspensions. The court held that it did not, pointing out:

"[I]f our reciprocal disciplinary order became effective thirty days after entry, we could never order that it run during the same period as in the state where the misconduct occurred unless the court in that jurisdiction stayed its own order. Indeed, in many cases, especially those involving short suspensions, the suspension periods in the two juris-

dictions would never even intersect. *Such a result would tend to increase the punishment far beyond that intended by the original state and far beyond the degree of discipline warranted."*

*Matter of Goldberg, supra,* 460 A.2d at 985. (Emphasis added).

The court made clear that reciprocal suspensions need not always be concurrent and that there may be situations in which a concurrent suspension would result in a grave injustice. It concluded, however, that "concurrency will be the norm," and that "[w]hether a particular suspension should be concurrent will depend to a considerable extent on the actions of the attorney involved." *Id.* The court explained that, if the attorney promptly notifies Bar Counsel of the disciplinary action imposed in another State and "voluntarily refrains from practicing law in the District of Columbia during the period of suspension in the original jurisdiction," there would "probably be no reason to aggravate the discipline by making the District of Columbia suspension wholly or partially consecutive to that imposed elsewhere." *Id.* On the other hand, if the attorney unreasonably delays notifying D.C. Bar Counsel or engages in practice in the District while suspended elsewhere, "a more severe sanction may be justified." Because there was no evidence as to whether Goldberg practiced in the District during the period of his Maryland suspension, the court remanded the matter to the Board.

The D.C. Court of Appeals has followed *Goldberg* in a number of succeeding cases. *See,* for example, *In re Slosberg,* 650 A.2d 1329 (D.C.1994); *In re Klein,* 723 A.2d 864 (D.C. 1999); *In re Soininen,* 853 A.2d 712 (D.C.2004); *In re Hines,* 867 A.2d 963 (D.C.2005); *In re O'Toole,* 877 A.2d 151 (D.C. 2005). The same approach, of determining whether the facts of the particular case warrant making the reciprocal suspension concurrent, either by making it of equivalent length but retroactive or by terminating it upon termination of the suspension in the other State, has been taken in Kentucky, Ohio,

Nevada, New York, South Carolina, South Dakota, and Wisconsin.[2]

■ We believe that this is a reasonable approach, one that is fully consistent with the notion and function of reciprocal and corresponding discipline. If an attorney who is suspended in another State promptly notifies Maryland Bar Counsel of that suspension, as required by Maryland Rule 16–773(a), and promptly ceases the practice of law in Maryland during the period of that suspension, any corresponding, reciprocal period of suspension ordered by us, *ordinarily*, should be concurrent with that imposed in the other State, whether through the device of retroactive commencement of the reciprocal discipline or by terminating our suspension upon termination of the suspension to which it is reciprocal.

■ As the D.C. Court of Appeals made clear in *Goldberg*, however, concurrence is not a matter of right but of our own discretion and practice, to be used when the circumstances warrant. When appropriate, it serves multiple purposes. It encourages attorneys suspended in other States to notify Bar Counsel promptly. It gives them the option of possibly reducing the period of suspension in Maryland by voluntarily ceasing practice here during the period of the foreign suspension,

---

**2.** *See Kentucky Bar Ass'n v. Marsick,* 986 S.W.2d 899 (Ky.1999) (concurrent suspension denied because of delay by lawyer in reporting six month suspension in Ohio); *Office of Disciplinary Counsel v. Drury,* 54 Ohio St.3d 601, 561 N.E.2d 540 (1990) (suspension made concurrent with term in District of Columbia); *Copren v. State Bar,* 64 Nev. 364, 183 P.2d 833 (1947) (suspension made concurrent to that imposed in California); *In re Tuohey,* 259 A.D.2d 157, 694 N.Y.S.2d 36 (1999) (imposing six month suspension retroactive to commencement of New Jersey suspension); *In re Farrington,* 263 A.D.2d 248, 701 N.Y.S.2d 354 (2000) (concurrent suspension denied because attorney delayed in notifying New York disciplinary authority of Connecticut suspension); *In re James,* 342 S.C. 17, 535 S.E.2d 911 (2000) (one year suspension made retroactive to commencement of suspension in Kentucky); *In re Brown,* 60 S.D. 628, 245 N.W. 824 (1932) (suspension made concurrent with that imposed in Wyoming); *Matter of Disciplinary Proceedings Against Malek,* 192 Wis.2d 67, 531 N.W.2d 53 (1995) (suspension made retroactive to that imposed in Illinois because attorney promptly notified Wisconsin authorities of Illinois suspension and refrained from practicing law in Wisconsin during period of Illinois suspension).

and thus (1) makes the sanction here more contemporaneous with the misconduct on which it is based, and (2) provides more immediate protection to the Maryland public, which is the main function of the reciprocal discipline in the first place. If the attorney delays in notifying Bar Counsel of the out-of-State suspension, or declines to cease any practice of law in Maryland, or there is any other circumstance making a concurrent suspension inappropriate, that benefit will be unavailable.

In this case, we find no basis under Maryland Rule 16–773(e) for not imposing an eighteen month suspension based on the findings and conclusions of the D.C. Court of Appeals. Indeed, but for Bar Counsel's recommendation, we may well have considered a more severe sanction. It is not clear from the record now before us when Midlen notified Bar Counsel of the D.C. suspension or whether he continued to practice law in Maryland after commencement of that suspension on December 10, 2005. We therefore have no evidentiary basis at this point for making our suspension concurrent with that imposed in the District. Accordingly, the suspension shall commence upon the issuance of this opinion and run for its full term of eighteen months.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST JOHN H. MIDLEN, JR.**